### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**VICTORIA LYNNE SHELTON,**

      **Plaintiff,**

**v.**                                  **CASE NO. 2:11-cv-00639**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

### M E M O R A N D U M   O P I N I O N

    This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

    Plaintiff, Victoria Lynne Shelton (hereinafter referred to as "Claimant"), filed an application for DIB on June 5, 2009, alleging disability as of August 15, 2007, due to depression, anxiety, fibromyalgia, diabetes, neuralgia, gastroparesis, irritable bowel syndrome [IBS], fatigue, insomnia, chronic fatigue, digestive pain, problems concentrating, vertigo, hands and arms go numb, and menopause with hot flashes.  (Tr. at 9, 124-28, 155-66, 210-16, 234-40.)  The claim was denied initially and upon reconsideration.  (Tr. at 9, 64-68, 73-75.)   On December 9, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 76-77.)  The video hearing was held on November 17, 2010 before the Honorable James P. Toschi.  (Tr. at 26-61, 85, 92, 121.)  By decision dated November 30, 2010, the ALJ determined that Claimant was not entitled to

benefits.  (Tr. at 9-21.)  The ALJ's decision became the final decision of the Commissioner on September 2, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-3.)  On September 19, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. § 404.1520(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant

is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 404.1520(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date through the date of the ALJ's decision.  (Tr. at 11.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of fibromyalgia, diabetes, depression, and anxiety.  (Tr. at 11-12.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 12-14.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 14-20.)  As a result, Claimant can return to her past relevant work as a claims examiner.  (Tr. at 20-21.)  On this basis, benefits were denied.  (Tr. at 21.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a

> preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 53 years old at the time of the administrative hearing.  (Tr. at 33.)  She has a high school education and six and one-half years of college education.  (Tr. at 41.)  In the past, she worked as a telemarketing quality assurance representative, health insurance claims processor, answering service operator, census worker, customer service representative at a catalog call center, fast food restaurant employee, and cashier/clerk at a discount store.  (Tr. at 196.)

The Medical Record

The court has reviewed all evidence of record.  Claimant challenges only the ALJ's assessment of her mental impairments; thus the court will summarize only the mental health evidence.

Records indicate Claimant began treatment with Mary McKelvey, M.D., New River Health Association, on July 28, 2003 for "Diabetes.  Depression.  Fibromyalgia…In no acute

distress...The fibromyalgia is disabling.  She's not able to work with this.  She's trying to get short term disability at the present time."  (Tr. at 322.)

On February 26, 2006, Dr. McKelvey stated: "Vicki is here to follow up on diabetes and fibromyalgia... Fibromyalgia is very unpredictable for her."  (Tr. at 295.)

On October 5, 2006, Dr. McKelvey stated:

Vicki is here for followup on diabetes, fibromyalgia, and depression.  She is doing about the same.  We talked a lot about work.  She is working full time.  She is having a very tough time doing it.  She is on a 90-day end of contract because she is not able to work the mandatory overtime.  She is the only one that can make this decision.  It is a difficult decision.  It is unfortunate that they can not give her an accommodation for her fibromyalgia.

(Tr. at 291.)

On December 6, 2006, Curtis H. Thomas, D.O., New River Health Association, stated: "CC [chief complaint]:  Patient comes in for refill on her prescription for Lortab 7.5 which she takes for fibromyalgia and arthritis...She is markedly depressed today and we have had a long discussion."  (Tr. at 290.)

On December 21, 2007, Dr. McKelvey noted: "Vicki is here after about a year's absence...PROBLEM LIST: Diabetes, Hyperlipidemia. Depression. Fibromyalgia. Chronic yeast infections.  Genital herpes."  (Tr. at 289.)

On February 20, 2008, Dr. McKelvey stated: "Vicki is here for followup.  She says she has been off of Levoxyl for a year.  She also wants to get off of Lyrica which is causing strange irritability and psychotic events.  She feels hot all of the time...She says she is having personality changes from Lyrica."  (Tr. at 285.)

On May 23, 2008, Gail Kinsey, M.A., LPC, New River Health Association, stated:

Fibromyalgia pain is constant.  Not happy in marriage...No longer working so income is decreased.  What's helping the patient cope or get better: Gardening.

5

Reading. Going to college and doing very well and works hard to get excellent grades. Reading "The Fibromyalgia Solution" and thinking about how trauma from past abuse may have contributed to the fibro pain. Plans to work for Energy Express this summer. Still active with home schoolers group.

(Tr. at 284.)

On August 29, 2008, Dr. McKelvey, M.D. stated:

Vicki is here today for medical f/u [follow up] for her multiple problems. To me she is always very interesting. She is highly intelligent. She is going to New River Technical Community College and taking two courses and actually helping to teach another course in transcription. She has problems with concentration. She thinks she might get into what is known as "fibro-fog" that is seen in fibromyalgia. She wonders if there may be an element of attention deficit. She absolutely cannot take Lyrica, she said that it gave her homicidal ideation.

(Tr. at 277.)

On February 20, 2009, Dr. McKelvey stated:

Vicki is here for a followup...Unfortunately, she now has to go on disability. She was in a lawsuit with Wells Fargo over her disability. The case was settled...She has chronic fatigue. The depression is getting worse. She is going to see Gail Kinsey today which is a very good thing. She may need to see a psychiatrist. She is very resistant to going on psychiatric medications but will certainly discuss this at her next visit. The new intervention at this time is oxycodone.

(Tr. at 268.)

On August 12, 2009, a State agency medical source completed a Disability Determination Examination. (Tr. at 325-31.) The evaluator, Sunny S. Bell, M.A., licensed psychologist, completed a clinical interview and made these findings:

MENTAL STATUS EXAMINATION: Appearance: Ms. Shelton was cleanly and casually dressed...Grooming and hygiene skills were good. She did not wear makeup. Her height is 5 feet, 5 inches and her weight is 190 pounds. She has green eyes and long gray hair, which she wore in a pony tail. Dental hygiene appeared adequate. She wore prescribed eyewear. No hearing difficulties were noted. She had a tattoo on the outside of her right calf. Attitude/Behavior: Ms. Shelton was cooperative and motivated. She interacted in a socially appropriate manner. She did not spontaneously

generate conversation nor did she exhibit a sense of humor.  Eye contact was good.  She appeared comfortable.  <u>Speech</u>:  Her speech was clear, goal-directed, and relevant.  <u>Orientation</u>: She was oriented x4.  <u>Mood</u>: Her mood was depressed and she became tearful during the interview.  Several times she broke down sobbing.  Her affect was restricted.  <u>Thought Process</u>: Thought processes were logical and organized.  <u>Thought Content</u>: She reported no delusions, obsessions, or phobias.  <u>Perception</u>: No perceptual problems were noted.  <u>Judgment</u>: Judgment was within normal limits and when asked the envelope question, Ms. Shelton replied, "I would put in the mail box."  <u>Suicidal/Homicidal Ideation</u>: She denied suicidal or homicidal ideations.   <u>Immediate Memory</u>: Immediate memory skills were within normal limits and she could correctly repeat four items.  <u>Recent Memory</u>: Recent memory skills were moderately deficient and she could correctly recall only two of four items after five minutes.  <u>Remote Memory</u>: Remote memory skills were within normal limits and she gave an adequate history.  <u>Concentration</u>: Concentration was within normal limits and she correctly performed serial 7's.   <u>Psychomotor Behavior</u>: She exhibited no gross psychomotor difficulties.

<u>DIAGNOSTIC IMPRESSION</u>:
Axis I  311              Depression Disorder, not otherwise specified
          300.01        Panic Disorder without agoraphobia
Axis II    V71.09        No diagnosis...

<u>DIAGNOSTIC RATIONALE</u>: Depressive disorder, NOS is listed based upon the following: Ms. Shelton presented with a depressed mood and restricted affect.  She was tearful during the interview.  She did not spontaneously generate conversation nor did she exhibit a sense of humor.  She complains of depression, crying episodes, decreased energy, sleep difficulties, irritability, decreased libido, hopeless, helpless, worthless and useless feelings, low self-esteem, thoughts of dying, difficulty with concentration, and or being withdrawn and apathetic.

Panic Disorder without agoraphobia is listed based upon the following.  Ms. Shelton complains of panic attacks in which her heart races.  She trembles and shakes and has difficulty breathing.  Her panic attacks can occur anywhere.

<u>DAILY ACTIVITIES</u>: When asked to describe a typical day.  Ms. Shelton stated, "I straighten up the house." Ms. Shelton takes care of her own hygiene and grooming independently and adequately.  She and husband take care of the housework, cooking, dishes, laundry, and shopping. Ms. Shelton put out a small garden this spring.  She drives, puts gas in her vehicle, and runs errands.  She takes walks around her yard and sits outside.  She goes to the post office.  She enjoys reading fiction and non-fiction.  She watches

television.  She manages the family's finances and uses a debit card but has not used a checkbook in years.  She denied all other activities.

SOCIAL FUNCTIONING: Based on the clinical interview and the mental status examination, Ms. Shelton interacted within normal limits.  She visits with friends and family but denied that they had family gatherings.  She does not have grandchildren.  When asked about her relationship with her in-laws, she stated, "We're not in touch with any of them."  Ms. Shelton enjoys eating out.  She home-schools her son.  She occasionally goes to the movies and to the mall.  When asked to describe herself socially, Ms. Shelton stated, "I have two people that I get together with but with them I feel like I'm not holding my end of things.  Other than them I don't like people."  Ms. Shelton denied all other social activities.

PROGNOSIS: Poor.

PACE: Within normal limits.

PERSISTENCE: Within normal limits.

CAPABILITY: It is believed that Ms. Shelton would be capable of managing her own benefits should they be awarded.

(Tr. at 327-29.)

On September 2, 2009, a State agency medical source completed a Psychiatric Review Technique form.  The evaluator, Hillel Raclaw, Ph.D., provided the assessment for the time period of August 15, 2007 to September 2, 2009 and concluded that Claimant's affective (depression) and anxiety-related (panic disorder without agoraphobia) disorders were not severe during this time period.  (Tr. at 332, 335, 337.) He found that Claimant had no restrictions of activities of daily living, no episodes of decompensation, each of extended duration, and mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  (Tr. at 342.) Dr. Raclaw noted that Claimant's last mental evaluation showed that her immediate memory, remote memory, concentration, persistence, pace, and social functioning were within normal limits.  (Tr. at 344.)  He

concluded that Claimant "cooks, drives, shops, reads, [has] friends, attends school. Mental issues *per se* non-severe." Id.

On November 24, 2009, a State agency medical source concluded that a Mental Residual Functional Capacity [MRFC] Assessment was necessary in order to evaluate the severity of Claimant's impairment using the Psychiatric Review Technique. (Tr. at 373.) The evaluator, Holly Cloonan, Ph.D., found that Claimant had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration. (Tr. at 383.) Dr. Cloonan concluded that the evidence did not establish the presence of the "C" criteria. (Tr. at 384.) She stated:

> The claimant appears mostly credible although allegations of sx [symptom] severity are not fully supported by MER [medical evidence of record] in file. Claimant does appear quite depressed at the CE [clinical evaluation] and noted that her college grades have suffered d/t [due to] trouble w/ [with] concentration, consistent w/ moderately deficient recent memory found on the initial MSE [mental status evaluation]. Even so, ADLS [activities of daily living] do not appear more than mildly limited. Tx [treatment] source planned to refer her for counseling. See MRFC.

(Tr. at 385.)

On November 24, 2009, Ms. Cloonan completed a Mental Residual Functional Capacity [MRFC] Assessment wherein she found that Claimant was "Not Significantly Limited" in all areas of assessment, save for "[t]he ability to maintain attention and concentration for extended periods" wherein she found Claimant "Moderately Limited." (Tr. at 387-88.) Ms. Cloonan concluded: "The claimant may have the above mod. [moderate] limit in F.C. [functional capacity] over the course of a typical workday. She is able to learn and perform work-like activities in a low pressure setting w/ few distractions."

(Tr. at 389.)

On October 27, 2009, November 24, 2009, December 22, 2009, and January 19, 2010, Claimant was treated by Omar Hasan, M.D., a psychiatrist, for depression. (Tr. at 396-400.) At the initial evaluation on October 27, 2009, Dr. Hasan noted:

> MENTAL STATUS: Patient appears appropriate for stated age, casually dressed, grooming is fair. She's cooperative. Alert & oriented x3. Speech is normal rate and volume. Varies in tone. Mood is____. Has marked level of anxiety & psychomotor activity is slightly increased. Thoughts are mostly linear and logical with no formal thought disorder. No suicidal or homicidal ideations. No auditory, visual or tactile hallucinations. Judgment and insight are partial. Estimated intelligence is average.
>
> PSYCHIATRIC DIAGNOSES:
> AXIS I:      Major depressive disorder. Anxiety, NOS. R/O adjustment
>              disorder.
> AXIS II:     Deferred.
> AXIS III:    Please refer to past medical history.
> AXIS IV:     Stressors include AXIS I diagnosis.
> AXIS V:      GAF - 50.[1]
>
> PLAN: Patient was not acutely suicidal, homicidal, or psychotic, and does not warrant acute psychiatric admission. I will place her on Wellbutrin-SR 100 mgs PO bid to help with symptoms of depression & anxiety, help increase her energy level & help improve weight loss. I advised her not to take second dose later than 3:00 PM. I'll place her Trazodone 100 mgs qhs to help aide with sleep. Patient was counseled regarding rationale for therapy, possible medication side effects, and voiced understanding. Will continue as outlined above & have her return to clinic in approximately one month.

(Tr. at 396-97.)

At the following three office visits on November 24, 2009, December 22, 2009, and

---

[1]      A GAF of 41-50 is defined as "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 2000).      A GAF rating between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers). American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. (Text Revision) 2000).

January 19, 2010, Dr. Hasan stated Claimant's psychiatric diagnoses to be "Major depressive disorder. Anxiety, NOS." (Tr. at 398-400.)

On November 24, 2009, Dr. Hasan noted that Claimant was sleeping better and that her concentration was "a little bit better." (Tr. at 398.)

On December 22, 2009, Dr. Hasan noted:  "She is upset regarding her decision to leave her husband...She was doing well until this week...She reports that she is sleeping well and her anxiety is controlled with the Serax...She denies any medication side effects." (Tr. at 399.)

On January 19, 2010, Dr. Hasan stated: "I will increase Wellbutrin SR to 200 mgs bid.  I'll continue present dose of Lexapro, Risperdal, Serax & Trazodone & have her return to clinic in approximately one month."

On January 26, 2010, Dr. Hasan completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form.  (Tr. at 393-95.) Dr. Hasan marked that Claimant had a "Fair" ability to follow work rules; relate to co-workers; use judgment; interact with supervisor(s); maintain attention/concentration; understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex job instructions; maintain personal appearance; behave in an emotionally stable manner; and demonstrate reliability.  (Tr. at 393-94.)  Dr. Hasan marked that Claimant had a "Poor" ability to deal with the public; deal with work stresses; function independently; understand, remember and carry out simple job instructions; and relate predictably in social situations.  Id.  He marked "Yes" to the question: "Can the individual manage benefits in his or her own best interest?" (Tr. at 395.)

Records indicate Claimant received treatment and medication management at New

River Family Health Center from January 19, 2010 through September 30, 2010 for a variety of ailments, including depression and anxiety.  (Tr. at 411-21, 465-70.)

On May 20, 2010, Gail Kinsey, LPC, New River Family Health Center, stated:

Very depressed.  Feels like she is a failure and ever since she left ex-spouse John she has made bad decisions for herself and her children...Can't forgive herself for past problems and wonders if she is still in love with ex-spouse. Enjoys his visits when he comes to see their son, Nathan.  Has been very upset by Nathan's behavior and found out he has been abusing pain medications probably since 2001.  Pt admits he has stolen her pain meds and she now hides them...

She completed another college semester and really enjoyed the courses because she chose them.  Finances are still a struggle...Surprised but pleased that son, Jared, is in college and working some as a DJ in Princeton and living on his own.  Worries about youngest son, Dylan, who has no ambition like his father (pt current spouse).

(Tr. at 416.)

On May 27, 2010, Ms. Kinsey reported:

The chief complaint is: F/U [follow up] depression...Pt feeling slightly better but upset that son, Nathan, stole some of her pain pills again; she is insisting that he call for treatment somewhere.  She did get her garden planted including some herbs and is satisfied with herself for that.  She also feels good that she cleaned off her desk where she does homework...Struggled to think of positive things about Clyde and doesn't know why things have changed...He does help with household chores.

(Tr. at 414.)

Records indicate Claimant was treated at Active Recovery Physical Therapy from June 9, 2010 through August 20, 2010 for her fibromyalgia pain and depression complaints.  (Tr. at 423-51.)  A. Casey Gioeli Whitaker, Physical Therapist, stated that Claimant would be treated with "soft tissue work, stress management, therapeutic yoga/flexibility and gentle strengthening" two to three times a week for 8 weeks.  (Tr. at 424-25.)  Claimant completed 19 visits and was discharged on August 20, 2010: "The

patient says she is feeling much better now.  She feels that she is on the right track and can maintain from this point on." (Tr. at 448.) "The patient says she is ready to be discharged so she can save some of her therapy appointments for future use if needed.  She is ready to maintain herself with the knowledge she has received during her treatments." (Tr. at 451.)

On September 16, 2010, Ms. Kinsey noted Claimant "wants to get off her opiate pain medications.  Is pleased and interested in her college classes this semester.  Medical sociology class will probably be motivation to look at some lifestyle changes.  Son, N, is doing better...and she is feeling more optimistic about him." (Tr. at 469.)

On September 16, 2010, Mohammad K. Hasan, M.D., New River Family Health Center noted:

> Overall condition: fair.  She had been seen by Dr. Omar, currently being seen by me because she is going to school.  She is studying Sociology...
>
> Pt is neat, tidy, cooperative and relevant, casually dressed and appears stated age.  Maintains good eye contact and is oriented x3.  Speech is normal rate and volume.  Mood is stable.  Affect is euthymic.  Thoughts are logical with no indication of psychosis.  Psychomotor activity is normal.  Insight and judgment are fair.
>
> Assessment: Major Depression.  Depressive Disorder, NOS...
>
> Plan: Psychoactive medication management.  Medication instruction.

(Tr. at 469.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to consider the effect of major depressive disorder and anxiety disorder on Claimant's residual functional capacity to perform her past relevant work as a claims examiner.  (Pl.'s Br. at 11-14.)  Specifically, Claimant asserts:

The ALJ's decision must be supported by substantial evidence. In this record, there is no analysis of the limitations imposed by the GAF score of 50 reported by the plaintiff's treating physician, Omar Hasan, M.D.

Under the Global Assessment of Functioning (GAF) Scale, a score of 50 indicates serious symptoms...or any serious impairments in social, occupational or school functioning (e.g. no friends, unable to keep a job).

The ALJ erred when he disregarded the opinion of the plaintiff's treating physician regarding the plaintiff's functional capacity as reflected by the GAF score...

Due to the failure of the ALJ to provide controlling weight to the opinion of the plaintiff's treating physician regarding plaintiff's functional capacity, without explanation, the ALJ's finding that the plaintiff can perform work at her past relevant work as a claims examiner is erroneous.

(Pl.'s Br. at 11-13.)

<u>The Commissioner's Response</u>

The Commissioner responds that substantial evidence supports the ALJ's finding that Claimant was not disabled under the Social Security Act during the relevant time period and that the ALJ properly evaluated Claimant's mental impairments. (Def.'s Br. at 9-15.)

Specifically, the Commissioner asserts:

There is no merit to Plaintiff's assertion that the ALJ did not properly consider the effect of her mental impairments on her ability to perform her past relevant work (Pl.'s Br. at 11).

First, the ALJ explicitly considered the effect of Plaintiff's depression and anxiety by finding them to be severe impairments at step two (Tr. 11) and by incorporating specific functional limitations in the residual functional capacity assessment to account for the resulting functional limitations (Tr. 14).

Second, although Plaintiff asserts that the ALJ's failure to evaluate a GAF score assessed by Dr. Hasan renders the ALJ's decision unsupported by substantial evidence (Pl.'s Br. at 11), GAF ratings have no direct legal or medical correlation to the severity requirements in the Commissioner's

14

regulations.   Therefore, a GAF score is never dispositive on the issue of disability.   65 Fed. Reg. 50746-01, 50764-65 (2000).   Moreover, Dr. Blair testified that GAF scores are not the best metric for assessing the severity of a mental impairment because they are "random" and there are "different reasons" why they may be given, further stating that a score of 50 is on the low end of moderate symptoms and that Plaintiff improved since the score was assessed (Tr. 49).    Moreover, Dr. Blair explained he would not necessarily expect that an individual assessed with a score of 50 would have any difficulty working full time because the score is a "snapshot" and "nothing in the score specifically talks about work skills or habits or abilities" (Tr. 49-50)...Accordingly, it was not error for the ALJ to have not discussed the single GAF score of 50 assigned by Dr. Hasan because the score is neither probative nor determinative in the analysis of Plaintiff's mental impairment.

Third, Plaintiff's argument that Dr. Hasan's opinion was entitled to controlling weight is without merit (Pl.'s Br. at 11-13).   A treating source's opinion is not automatically entitled to great or controlling weight and does not bind the Commissioner on the issue of whether a claimant is able to work; rather, the determination of disability, contrary to Plaintiff's implication, is a legal determination and solely the responsibility of the Commissioner.   20 C.F.R. § 404.1527(e).   More specifically, it is the responsibility of the ALJ, not the treating physicians, to determine a claimant's RFC.   20 C.F.R. § 404.1546...

The ALJ gave little weight to Dr. Hasan's opinion because it was inconsistent and because it was not supported by the doctor's own treatment notes or the evidence as a whole.   (Tr. 20.)   20 C.F.R. § 404.1527(d)(3-4).   Indeed, Dr. Hasan's limited treatment notes show that, although Plaintiff had some symptoms of depression and anxiety during the times in which she reported situational stressors including leaving her husband, she reported improved symptoms shortly after starting medication therapy (Tr. 398-400)...

As Dr. Blair testified, the record does not show that Plaintiff had more than moderate limitations in any functional area, particularly in light of her ability to succeed in her college courses.   As a finder of fact, the ALJ was entitled to give significant weight to Dr. Blair's expert opinion.   See 20 C.F.R. § 404.1527(f)...Both the regulations and the Supreme Court endorse the use of medical advisors, like Dr. Blair, at administrative hearings.   20 C.F.R. § 404.1546; Richardson v. Perales, 402 U.S. 389, 408 (1971)...

Moreover, although treatment notes document Plaintiff's subjective complaints, these statements alone are insufficient to establish an impairment affecting her ability to work...

Therefore, because Dr. Hasan's opinion was unsupported by his own

treatment notes and inconsistent with the objective medical evidence throughout the record, the ALJ properly gave it little weight.

(Def.'s Br. at 10-15.)

Analysis

Claimant argues that the ALJ erred in evaluating the treating physician's assessment of a GAF score of 50 and the effect of major depressive disorder and anxiety disorder on Claimant's residual functional capacity [RFC] to perform her past relevant work as a claims examiner.

The ALJ made these findings regarding Dr. Hasan's reports, the State agency medical source opinions, the testimony of the psychological expert, as well as Claimant's testimony and documents she completed in connection with her application for disability benefits, regarding Claimant's mental health and Claimant's RFC:

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. The undersigned notes that Dr. David Blair credibly testified that none of the claimant's mental impairments, either singly or in combination, medically meet or equal any of the listed impairments contained in Appendix 1, Subpart P, Regulations No. 4.

In activities of daily living, the claimant had mild restriction. The claimant testified that her family helps her with necessary chores; her husband vacuums and her son cleans the bedrooms. The claimant testified that she does some cooking and she works in her garden; she also attends college classes two days per week. On documents submitted in connection with her application for disability benefits, the claimant indicated that she helps take

16

care of pets and other people in her household; she indicated that she had some problems with personal care activities that involve reaching.  The claimant indicated that she cooked most days and that she did laundry, swept, washed dishes, and occasionally cleaned (Exhibit 4E).  More recently, the claimant indicated that she had trouble reaching to do certain personal care activities; she indicated that she shared household chores with her family members.  She indicated that she was able to do most household chores that did not require heavy lifting or scrubbing, and she also performed light gardening activities (Exhibit 12E).

In social functioning, the claimant has mild difficulties.  The claimant testified that she attends college courses; the record also reveals that she participated in yoga classes.  On documents submitted in  connection with her application for disability benefits, the claimant indicated that she shopped in stores at least once a week; she talked with her family daily and also corresponded with family and friends on the computer.  Although she was involved in no regularly scheduled social activities, the claimant indicated that she visited the library about once a week; her mother occasionally accompanied her for security.  The claimant further indicated that she experienced frustration as a result of her symptoms, so she sometimes avoided people (Exhibit 4E).  More recently, the claimant indicated that she shopped for groceries every other week; she spent time daily talking to her sons and communicated with others via the computer or occasionally in person.  She indicated that she occasionally met with college classmates for social activities.  She indicated that sometimes she could not deal with people due to irritability due to her symptoms of pain (Exhibit 12E).

With regards to concentration, persistence or pace, the claimant has moderate difficulties.  The claimant testified that she is doing well in her college classes and that she receives no special accommodations.  However, she testified that she received some "incompletes" prior to treatment for her mental health symptoms.  She testified that symptoms of pain interfere with her thoughts and distract her from homework, on occasion.  On documents completed in connection with her application for disability benefits, the claimant indicated that she was able to pay bills, count change, and handle bank accounts, although she occasionally forgot to pay bills.  She indicated that she reads most days, watched some television, and researched genealogy; she additionally indicated that she frequently napped throughout the day and had problems remembering spoken instructions (Exhibit 4E).  More recently, the claimant indicated that she forgot to pay bills and did not keep adequate records of spending; she spent time throughout the day reading and watching television.  The claimant indicated that she could pay attention for up to one hour and that she needed written instructions to remember details, but she could remember events from as long as 30 years in the past (Exhibit 12E).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria for 12.04 in that there is no medically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation in the ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support as well as repeated episodes of decompensation, each of extended duration; or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. Additionally, there is no evidence of any anxiety related disorder that has resulted in complete inability to function independently outside of one's home.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.


After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b)...the claimant is capable of performing detailed instructions and tasks with occasional public contact and frequent interaction with co-workers and supervisors; she can tolerate no more than moderate stress.

*       *       *

Turning now to the claimant's alleged mental impairments, the claimant's primary care physician at the New River Health has treated her symptoms of

depression since at least 2003. On December 6, 2006, the claimant was markedly depressed and additional medications were prescribed to control her symptoms. On May 23, 2008, the claimant was no longer working, and she reported that she was no[t] happy in her marriage, she experienced constant pain, but she enjoyed gardening, reading, and attended college classes with excellent grades (Exhibit 3F).

By February 20, 2009, the claimant's symptoms of depression were worsened, but she remained resistant to psychiatric medications; on July 23, 2009, her diagnoses included seasonal pattern of depression; on September 20, 2009, the claimant again refused medication or counseling to alleviate her symptoms of anxiety and depression (Exhibit 9F). On October 27, 2009, Omar Hasan, M.D. evaluated the claimant and she reported symptoms of depression including decreased sleep, decreased energy, and poor concentration; mental status examination revealed a marked level of anxiety and slightly increased psychomotor activity. Dr. Hasan diagnosed major depressive disorder; anxiety, not otherwise specified (NOS); and rule out adjustment disorder. He prescribed medications to control the claimant's symptoms, increase her energy level, and help her with weight loss. The claimant followed up on November 24, 2009, and reported better sleep, and better concentration; her energy level remained the same. The claimant's diagnoses were major depressive disorder and anxiety NOS. On December 22, 2009, the claimant was not doing well; she regretted separating from her husband. However, she reported that she slept well and that her symptoms of anxiety were controlled with medications. Adjustment disorder with mixed anxiety were added to the claimant's diagnoses. On January 19, 2010, the claimant reported that she slept fairly well, but still experienced decreased energy; she experienced marginal symptoms of anxiety, but also reported that some of her medications were not available at the pharmacy so she had not taken them recently (Exhibit 13F).

On March 16, 2010, the claimant's diagnoses were recurrent major depression and anxiety disorder NOS; on May 20, 2010, she was very depressed and questioned many of her decisions with regard to her personal life. Mental status examination revealed depressed mood, feelings of guilt, anxious and tearful affect; however, she had completed another semester of college. On May 27, 2010, she had depressed mood, but was slightly better. On July 13, 2010, the claimant reported that she felt better overall; she had anxious mood with full ranging affect. On July 22, 2010, she had euthymic mood. The claimant's mood remained stable on September 16, 2010, and she had euthymic affect (Exhibits 16 F and 19F).

On August 10, 2009, Sunny S. Bell, M.A., evaluated the claimant and she reported an array of physical problems as well as problems concentrating due to pain, insomnia, and symptoms of anxiety and depression including crying

spells, decreased energy, irritability withdrawal, and decreased libido. The claimant additionally reported episodes of panic attacks and constant anger. Mental status examination revealed depressed mood with some tearfulness and restricted affect; remote memory was moderately deficient; all other areas were within normal limits. Psychologist Bell diagnosed depressive disorder, NOS; and panic disorder without agoraphobia (Exhibit 6F).

At the hearing, Dr. Blair testified that the claimant's abilities were mainly limited by pain caused by fibromyalgia. He indicated that the claimant did well in school and he noted that during the evaluation performed by Psychologist Bell, the claimant had good concentration, persistence, and pace as well as good memory. Dr. Blair testified that in December 2009, the claimant's anxiety was well controlled with medication; in January 2010, he noted the claimant's decreased energy could have been due to lack of medications. Although Dr. Blair testified that the claimant had some limitations in her ability to perform work activities, he did not indicate that the limitations would preclude the claimant's ability to do all work. He testified that the claimant had the ability to occasionally interact with the public; to perform detailed, but not complex, instructions; to frequently interact with co-workers and supervisors; and to handle a moderate level of stress. Dr. Blair additionally testified that the claimant's testimony regarding her class schedule and her performance in college classes, revealed that she was able to handle "pressure" environments as well as able to perform detailed instructions. He opined that the poor ratings given by Dr. Hasan were inaccurate and not supported by the totality of the evidence. The undersigned gives significant weight to the testimony of this medical expert and finds that it is well supported by the record.

As to the effectiveness of treatment, the claimant has received treatment that has been essentially routine and/or conservative in nature and the record reveals that the treatment has been generally successful in controlling those symptoms.

As to the side effects of medications, the record does not contain any evidence of any side effects which would interfere with the claimant performing the jobs identified by the vocational expert.

The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

\*      \*      \*

Turning to the claimant's mental impairments, on September 2, 2009, Hillel Raclaw, Ph.D., completed a psychiatric review technique form and opined that the claimant's mental impairments were not severe (Exhibit 7F). On

November 24, 2009, Holly Cloonan, Ph.D., completed a psychiatric review technique form and opined that the claimant had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Exhibit 11F). Dr. Cloonan additionally completed a mental assessment form and opined that the claimant had moderate limitations in the ability to maintain attention and concentration for extended periods (Exhibit 12F). The undersigned gives significant weight to the opinions of Dr. Cloonan and finds that the limitations are well supported by the evidence of record.

On January 26, 2010, the claimant's treating psychiatrist Omar Hasan, M.D., completed a mental assessment form and opined that the claimant had poor abilities to deal with the public; deal with work stresses; function independently; understand, remember, and carry out simple job instructions; and relate predictably in social situations (Exhibit 13F, pages 2-4). The undersigned gives very little weight to the opinions of this treating physician as they are not supported by the record as a whole, or even when considered in connection with Dr. Hasan's treatment records. For example, the claimant attends college classes and passes the courses without special accommodation, which indicates better than poor ability to interact socially and handle pressure. Additionally, Dr. Hasan opined a poor ability with regard to simple job instructions, but fair ability to understand, remember, and carry out complex as well as detailed but not complex job instructions. The undersigned finds that these opinions are not congruent and, therefore, assigns them very little weight.

In sum, the above residual functional capacity assessment is supported by the testimony at the hearing and the evidence of record. While the undersigned finds that the claimant does experience pain and some symptoms of anxiety and depression, he does not find that the limitations from any of these conditions, either singly or in combination, would totally preclude all work activities.

(Tr. at 12-20.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 404.1527(d)(2) (2011). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and

laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527. These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(d)(2).

Under § 404.1527(d)(1), more weight is given to an examiner than to a non-examiner. Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Section 404.1527(d)(2)(I) states that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the

source's opinion. Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2010). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if

> conflicting medical evidence is present, the SSA has the
> responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The undersigned finds that the ALJ's decision reflects a careful consideration of Claimant's impairments, both alone and in combination in keeping with the applicable regulations.  Contrary to Claimant's assertions, the ALJ did not disregard the opinion of Claimant's treating psychiatrist, Dr. Hasan, when considering Claimant's disability and functional capacity.  More specifically, the undersigned concludes that the ALJ did not err in evaluating Dr. Hasan's October 27, 2009 assessment.  The ALJ clearly considered all of Dr. Hasan's reports, including the October 27, 2009 report:

> On October 27, 2009, Omar Hasan, M.D. evaluated the claimant and she reported symptoms of depression including decreased sleep, decreased energy, and poor concentration; mental status examination revealed a marked level of anxiety and slightly increase psychomotor activity. Dr. Hasan diagnosed major depressive disorder; anxiety, not otherwise specified (NOS); and rule out adjustment disorder.  He prescribed medications to control the claimant's symptoms, increase her energy level, and help her with weight loss.  The claimant followed up on November 24, 2009, and reported better sleep, and better concentration; her energy level remained the same.  The claimant's diagnoses were major depressive disorder and anxiety NOS.  On December 22, 2009, the claimant was not doing well; she regretted separating from her husband.  However, she reported that she slept well and that her symptoms of anxiety were controlled with medications.  Adjustment disorder with mixed anxiety were added to the claimant's diagnoses.  On January 19, 2010, the claimant reported that she slept fairly well, but still experience decreased energy; she experienced marginal symptoms of anxiety, but also reported that some of her medications were not available at the pharmacy so she had not taken them recently (Exhibit 13F).

(Tr. at 17-18.)

The undersigned finds it inconsequential that the ALJ did not specifically mention the GAF score of 50 assessed by Dr. Hasan.  Clearly, the ALJ considered the opinions of Dr. Hasan.  As pointed out by the Commissioner, GAF ratings have no direct legal or medical

correlation to the severity requirements in the Commissioner's regulations.  Therefore, a GAF score is never dispositive on the issue of disability.  65 Fed. Reg. 50746-01, 50764-65 (2000).  (Def.'s Br. at 10.)

The undersigned notes that Claimant's representative questioned  Dr. Blair at the November 17, 2010 hearing regarding Dr. Hasan's assessment of a GAF score of 50, and the ALJ was present and participating in the questioning. (Tr. at 48-50.)   Dr. Blair testified that GAF scores are not the best "metric" for assessing the severity of a mental impairment because they are "random" and there are "a lot of reasons" why they may be given, further stating that a score of 50 is "at the low end of moderate symptoms" and that Claimant's mental health "improved" since the score was assessed (Tr. 49-50).  Dr. Blair stated that he would not necessarily expect that a person with a GAF score of 50 would have difficulty working full time because the GAF score is a "snap shot in time" and "nothing that tells us specifically about work skills or habits or abilities" (Tr. 50).

The ALJ also clearly considered the mental assessment form completed by Dr. Hasan on January 26, 2010:

> On January 26, 2010, the claimant's treating psychiatrist Omar Hasan, M.D., completed a mental assessment form and opined that the claimant had poor abilities to deal with the public; deal with work stresses; function independently; understand, remember, and carry out simple job instructions; and relate predictably in social situations (Exhibit 13F, pages 2-4).  The undersigned gives very little weight to the opinions of this treating physician as they are not supported by the record as a whole, or even when considered in connection with Dr. Hasan's treatment records.  For example, the claimant attends college classes and passes the courses without special accommodation, which indicates better than poor ability to interact socially and handle pressure.  Additionally, Dr. Hasan opined a poor ability with regard to simple job instructions, but fair ability to understand, remember, and carry out complex as well as detailed but not complex job instructions. The undersigned finds that these opinions are not congruent and, therefore, assigns them very little weight.

(Tr. at 20.)

The undersigned finds that the ALJ did not err in giving little weight to Dr. Hasan's opinion because it was inconsistent with the objective medical evidence and because it was not supported by the doctor's own treatment notes.  20 C.F.R. § 404.1527(d)(3-4).

The undersigned also finds that the ALJ properly considered Claimant's mental impairments and their effect upon her ability to perform work.  The ALJ found Claimant's depression and anxiety to be severe impairments at step two of the sequential evaluation process.  (Tr. at 11.) The ALJ incorporated the specific functional limitations in the residual functional capacity assessment to account for the functional limitations resulting from Claimant's depression and anxiety: "[T]he claimant is capable of performing detailed instructions and tasks with occasional public contact and frequent interaction with co-workers and supervisors; she can tolerate no more than moderate stress."  (Tr. at 14.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: August 14, 2012

Mary E. Stanley
United States Magistrate Judge